**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AMANDA S.,**

                             **Plaintiff,**

**v.**                                      **5:18-CV-00473 (NAM)**

**ANDREW M. SAUL,**
**Commissioner of Social Security,** [1]

                          **Defendant.**
_____

**Appearances:**

Howard D. Olinsky
Olinsky Law Group
300 S. State Street - Suite 420
Syracuse, New York 13202
_Counsel for Plaintiff_

Oona M. Peterson
Social Security Administration
Office of Regional General Counsel - Region II
26 Federal Plaza - Room 3904
New York, New York 10278
_Counsel for Defendant_

**Hon. Norman A. Mordue, Senior United States District Court Judge**

**MEMORANDUM-DECISION AND ORDER**

**I.**      **INTRODUCTION**

       Plaintiff Amanda S. filed this action under 42 U.S.C. §§ 405(g) and 1383(c)(3),

challenging the denial of her application for Social Security disability insurance benefits ("DIB")

---

[1] Plaintiff commenced this action against Nancy A. Berryhill, as Acting Commissioner of the Social Security Administration. (Dkt. No. 1). Andrew M. Saul became the Commissioner of Social Security on June 17, 2019. Because Nancy A. Berryhill was only sued in her official capacity, Andrew M. Saul is automatically substituted as the named defendant in this action. Fed. R. Civ. P. 25(d). The Clerk of Court is respectfully directed to amend the caption.

and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). (Dkt. No. 1). The parties' briefs are presently before the Court. (Dkt. Nos. 9, 13). After carefully reviewing the administrative record, (Dkt. No. 14), the Court affirms the denial decision.

## II. BACKGROUND

### A. Procedural History

Plaintiff applied for disability benefits in January 2015, alleging that she had been disabled since February 23, 2014. (R. 222). Plaintiff alleged disability due to a heart valve problem, fibromyalgia, enlarged liver, pulmonary hypertension, anxiety and panic attacks, breathing problems, enlarged right side of the heart, an autoimmune disorder, carpal tunnel syndrome/tennis elbow, obesity, depressive disorder, and post-traumatic stress disorder. (Dkt. No. 9, p. 3). The Social Security Administration ("SSA") denied Plaintiff's application on April 6, 2015. (*See* R. 126–131). Plaintiff appealed that determination and requested a hearing before an Administrative Law Judge ("ALJ"). (*See* R. 132–133). The hearing was held on October 11, 2016 before ALJ Gretchen Mary Greisler. (R. 62–95). Plaintiff appeared at a second hearing on March 21, 2017, again before ALJ Greisler, where a vocational expert also testified. (R. 35–57). Plaintiff was represented by counsel at both hearings. On April 17, 2017, the ALJ issued a decision finding that Plaintiff was not disabled. (R. 10–24). Plaintiff's subsequent request for review by the Appeals Council was denied. (R. 1–6). Plaintiff then commenced this action on April 17, 2018. (Dkt. No. 1).

### B. Plaintiff's Background and Testimony

Plaintiff was born in 1984. (R. 69). She attended school until the tenth grade and received a GED in 2010. (R. 38). Plaintiff completed a Certified Nursing Assistant program and became a qualified nurse's aide. (R. 38–39). She worked as a nurse's aide from 2009 to

2014. (R. 75–76). Prior to her work as a nurse's aide, Plaintiff worked as a telemarketer, cashier, and laborer. (R. 274). Plaintiff testified that she stopped working because she was "taken out of work during [her] pregnancy with the heart condition." (R. 72). She has not worked since February 23, 2014. (*Id.*).

Plaintiff testified that she has tricuspid valve disease which caused severe pulmonary hypertension once she became pregnant. (R. 77). Plaintiff said that certain activities cause her breathing to become more difficult, such as getting up to go to the bathroom, walking to get her mail, and changes between hot and cold weather. (*Id.*). Plaintiff has also been diagnosed with sleep apnea and given a machine to use at night, but she does not feel any different since using it. (R. 78). Her sleep apnea has caused symptoms such as heaviness in her limbs, exhaustion, and constant tiredness. (*Id.*). After her pregnancy, Plaintiff also began experiencing pain from head to toe, exhaustion, memory loss, and "feel[ing] like [she] ha[d] electric through her body." (R. 79). Ultimately, she was diagnosed with fibromyalgia. (R. 78). In addition, Plaintiff was diagnosed with carpal tunnel syndrome, which caused her hands to "jam up" or "cramp." (R. 79–80). Plaintiff also recalled experiencing migraines "a couple times a week" which caused her to feel "nauseous, dizzy, pain in [her] head and neck . . . ." (R. 81). Plaintiff further testified that her neck "hurts every day," and sometimes her right knee "gives out." (R. 81–82). Plaintiff testified that she has "three bulging discs in my neck, a fraying shoulder, and a herniated and bulging disc in [her] lower back." (R. 88).

To treat these physical symptoms, Plaintiff testified that she was taking 28 pills each day, but now just takes medication for her autoimmune condition and two heart pills. (R. 82). Plaintiff testified that she also experiences psychological symptoms that began after she became pregnant, including feeling sad and depressed because of her physical conditions. (R.

3

83). She suffers from anxiety around people, which she claims has gotten worse because she does not want "[other people] looking at [her], like, 'what's wrong with her.'" (R. 84). Plaintiff was prescribed Xanax, but she does not take it because "it makes [her] too tired and [she is] already tired all the time." (*Id.*).

Plaintiff lives in a mobile home with her young son. (R. 70). With regard to daily activities, Plaintiff testified that her physical conditions cause difficulty dressing, bathing, and performing household tasks such as cleaning, cooking, or caring for her son. (R. 85–86). Specifically, Plaintiff testified that "pretty much anything I do it takes me a very long time to do it, and I have a hard time breathing or I cramp up, or just have to sit down." (R. 85). She also explained that she is only able to stand in one spot for 15 minutes, can only walk for 20 minutes, and "can sit in a chair . . . for an hour or so." (R. 87–88).

## C. Medical Evidence of Disability

Plaintiff's disability claim stems from conditions including Sjogren's Syndrome (an autoimmune disease), fibromyalgia, lupus, pulmonary hypertension, sleep apnea, heart valve disease, migraines, carpal tunnel syndrome, vertigo, depressive disorder, and anxiety attacks. (R. 66–68). Plaintiff claims that she has struggled with these conditions since 2010 and has received treatment from a number of medical providers.

### 1) Dr. Mark McSwain, Primary Care Physician

Plaintiff presented to Dr. McSwain in April 2012, complaining of chest tightness and anxiety. (R. 413). Plaintiff reported that she had been anxious for years, but that it was getting worse, even though Xanax provided some relief. (R. 413). Dr. McSwain increased Plaintiff's Xanax dosage, and noted that her heart palpitations were possibly caused by her anxiety disorder. (R. 416).

Dr. McSwain next examined Plaintiff in May 2013, when she presented with lumps on her ribcage and neck, a rash on her arms, concern about swollen lymph nodes, and concern about her weight gain. (R. 422). She also explained that she was no longer taking Cymbalta for her depression and requested a refill of Xanax because her anxiety was still not under control. (R. 423). Plaintiff's lymph nodes were not swollen at the appointment, and she refused lab testing or a CT scan of her neck. (R. 424). Dr. McSwain recommended that Plaintiff exercise to alleviate her weight gain. (*Id*.).

Plaintiff returned in October 2014, two months after the birth of her child. (R. 432). She complained of shoulder pain, possibility of fibromyalgia, excessive fatigue, memory loss, pain at her C-section scar, and a raw feeling in her throat. (R. 434). This was the first appointment with Dr. McSwain where Plaintiff discussed fibromyalgia. On exam, she showed 7/18 tender points (also known as "trigger points"), which did not meet the criteria for fibromyalgia, and it was noted that she may have "underlying depression that may be causing her symptoms." (*Id*.).

At a follow-up visit in December 2014, Plaintiff presented with increasing anxiety and fibromyalgia. (R. 437). She was not taking any medication for the anxiety, either because they were not covered by insurance or because she was unable to tolerate the side effects. (*Id*.). Dr. McSwain believed that her memory loss was caused by "her depression, not some underlying disorder from her previous drug use." (R. 442).

In February 2015, Dr. McSwain described Plaintiff as a "very anxious 30-year old woman." (R. 445). Plaintiff reported that her medications were not helping her feel much better, and she continued to have chest pains and shortness of breath. (R. 445, 447). Plaintiff

declined a different prescription from Dr. McSwain to treat her anxiety because she wanted to see a neurologist first.  (R. 445).

In an Employability Assessment Form dated July 31, 2015, Dr. McSwain found that there was "no evidence of limitation" as to Plaintiff's ability to sit or use her hands, and that Plaintiff had only "moderate limitations" in her ability to walk, stand, lift, carry, push, pull, bend, and climb.  (*See* R. 597).

### 2)  Nurse Practitioner Shelly Hollenbeck

Plaintiff first presented to Nurse Practitioner ("NP") Hollenbeck in November 2015 with symptoms including fatigue, forgetfulness, neck pain, joint pain, anxiety, and changes in sleep patterns.  (R. 629).  In an Employability Assessment Form dated November 8, 2015, NP Hollenbeck recommended that Plaintiff be referred to SSI because she had conditions that were permanent and expected to worsen: Sjogren's Syndrome, rheumatoid arthritis, back pain, and anxiety and depression were permanent and expected to worsen.  (R. 940–43).

On November 17, 2015, NP Hollenbeck noted that Plaintiff was prone to excessive crying, anxiety, fatigue, headaches, chronic "pain from head to toe," enlarged lymph nodes, and possible bulging discs in her back.  (R. 626).  On December 15, 2015, Plaintiff returned with worsening chronic fatigue, which was affecting her ability to care for her 15-month-old son.  (R. 631).  NP Hollenbeck advised her to "try to get some physical activity each day." (*Id.*).

On March 17, 2016, NP Hollenbeck completed a Medical Source Statement (cosigned by Dr. Adam Duckett) noting that Plaintiff's conditions would cause difficulties in a workplace environment such as requiring her to switch positions and take breaks, and she had recurrent daytime sleep attacks usually occurring three times per day and lasting 30 minutes each time.

(R. 896–901). NP Hollenbeck opined that Plaintiff would be unable to: (1) perform routine or repetitive tasks at a consistent pace; (2) achieve detailed or complicated tasks; (3) meet strict deadlines; (4) perform close interaction with coworkers/supervisors; (5) perform fast-paced tasks; or (6) withstand exposure to work hazards. (R. 898–99).

In May 2016, NP Hollenbeck completed another assessment finding that: (1) Plaintiff was "very limited" in her ability to lift, carry, push, pull, bend, or use stairs; (2) Plaintiff was "moderately limited" in her ability to walk, stand, and sit; and (3) there was "no evidence of limitations" for her ability to see, hear, speak, or use her hands. (R. 936–37). Psychologically, Plaintiff was "very limited" in her ability "to function in a work setting at a consistent pace." (*Id*.).

In September 2016, NP Hollenbeck assessed that Plaintiff had "marked" cardiac limitations, "severe limitations of functional capacity" causing her to be "incapable of minimal (sedentary) activity," and "moderate" mental impairment allowing Plaintiff to function only in limited situations and engage in limited interpersonal relations. (*See* R. 852–54). NP Hollenbeck concluded that "[b]ased on patient's current state of health, [I] don't believe she will be able to return to work anytime soon." (R. 854).

### 3) Dr. Felizen Agno, Auburn Cardiology Associates

From February 2014 to May 2016, Plaintiff presented to Dr. Agno, a cardiologist, for echocardiograms and other diagnostic tests to monitor her heart conditions. The tests identified that Plaintiff had a mild-to-moderately dilated right ventricle, a moderately dilated right atrium, a mildly thickened mitral valve, a mildly thickened tricuspid valve resulting in moderate-to-severe tricuspid regurgitation, and moderate pulmonary hypertension. (R. 359–69, 455–62, 561–95).

### 4) Dr. Karen Odrzywolski, Neurologist

In September 2014, Plaintiff visited Dr. Odrzywolski with concerns about pain in her hands and wrists. (R. 516). Dr. Ordzywolski performed a nerve conduction study, finding that Plaintiff suffered from carpal tunnel syndrome in both wrists. (*Id.*). Plaintiff's right wrist was mild in severity without sensory axon loss, while her left wrist was moderate in severity with mild sensory axon loss. (*Id.*). In February 2015, Plaintiff returned for a neurological evaluation due to her reported memory loss, anxiety, and depression. (R. 450). Dr. Odrzywolski assessed that Plaintiff's memory loss was likely due to her uncontrolled depression and anxiety, but Plaintiff declined medication. (R. 528–30).

### 5) Dr. James White, M.D.

On December 31, 2014, Plaintiff presented to Dr. White at the Mary Parkes Center for Asthma, Allergy and Pulmonary Care to evaluate her echocardiogram. (R. 381). Dr. White prescribed medication to address Plaintiff's right ventricle volume overload, noting that Plaintiff "seemed quite concerned about higher doses . . . it makes sense with her to start slow so as not to scare her." (*Id.*). Dr. White also noted that "[s]he has clear-cut symptoms of sleep apnea; sleep apnea is tightly associated with excess pain from fibromyalgia . . . ." (*Id.*). According to Dr. White, Plaintiff "continues to have profound difficulty with a variety of life's daily activity, and all of this is intensified by anxiety and a sense of loneliness around the care of her child." (*Id.*). Plaintiff performed a walking test, Dr. White concluded that her exercise tolerance was "moderate[ly] limited." (R. 382). Dr. White also commented on Plaintiff's fitness for work, concluding that:

> [g]iven her current level of anxiety about pulmonary hypertension and her heart function (added onto an already severe baseline anxiety disorder), I don't think it would be safe for her to work again as a nursing assistant. I also think she would have some physical

difficulty doing that until she regains some of her strength and
confidence. Therefore, for the next 30 days I would assess her as
unable to do any meaningful work as a certified nursing assistant.

(R. 382–83).

On February 10, 2016, Plaintiff returned for an evaluation of her obstructive sleep

apnea. (R. 544–46). She told Dr. White that she had been using her Continuous Positive

Airway Pressure ("CPAP") machine regularly, and the data showed she was using it for more

than 6 hours on average. (R. 544). However, she reported continued exhaustion throughout

the day. (*Id*.). Dr. White noted that the CPAP data showed "excellent treatment effect and

compliance." (*Id*.). Dr. White also found that the relevant cardiac, pulmonary, and laboratory

testing showed only "mild right ventricle enlargement and good right ventricle function." (*Id*.).

### 6) Dr. Hom Neupane, Rheumatologist

Plaintiff first presented to Dr. Neupane in April 2015, reporting generalized body pain,

which also caused poor sleep, depression, and anxiety since her pregnancy. (R. 691). Dr.

Neupane found that Plaintiff was experiencing 18/18 fibromyalgia tender points, but that other

causes had to be ruled out with further testing. (R. 695, 698). Dr. Neupane recommended low

impact aerobics and water exercises to improve circulation to Plaintiff's spastic muscles,

prevent de-conditioning, maintain range of motion, and aide sleeping. (R. 698). Dr. Neupane

also directed Plaintiff to maintain a more regular sleep schedule, and to avoid naps during the

day and sweets, caffeine, or exercise at night. (*Id*.).

Three months later, Plaintiff's blood test revealed positive levels of Antinuclear

Antibodies and Erythrocyte Sedimentation Rate, common indicators of an autoimmune

disease. (R. 707). Dr. Neupane determined that she may have a mild form of lupus or

undifferentiated connective tissue disease, and again found 18/18 fibromyalgia tender points.

(R. 705, 707). Plaintiff was diagnosed with fibromyalgia and continued on the same treatment. (R. 708).

Returning on August 26, 2016, Plaintiff reported that she had stopped taking all of her medication except for her magnesium, vitamin D, and ranitidine. (R. 717). As a result, Dr. Neupane prescribed medication to treat her connective tissue disease and encouraged her to remain active, sleep regularly, and maintain a healthy diet. (R. 722–23).

Dr. Neupane also completed two Medical Source Statements for Plaintiff. (R. 907–909). He diagnosed Plaintiff with "undifferentiated tissue disease" and gave her a fair prognosis. (R. 901.) He noted that she reported severe fatigue and poor sleep. (R. 901). Further, Dr. Neupane noted that her "[f]ibromyalgia may get worse with stress and temperature change." (R. 904). He estimated that Plaintiff's impairments were likely to cause her to be absent from work more than four days per month. (R. 904, 909). On both forms, he left blank the sections relating to Plaintiff's specific functional limitations, noting that she needed a functional capacity evaluation. (*See* R. 902, 907).

### 7) Jeanne A. Shapiro, Ph.D., Consultative Psychologist

On March 23, 2015, Plaintiff presented to Dr. Shapiro for a consultative psychiatric examination. (R. 463). Plaintiff reported that she had nightmares, flashbacks, and recurrent distressing memories that have caused her not to trust other people. (R. 464). Dr. Shapiro noted that Plaintiff reported panic attacks where she experienced difficulty breathing, increased heart rate, and tightness in the chest. (*Id*.). Plaintiff also reported getting depressed, tearful, unmotivated, and lethargic. (*Id*.).

Throughout the exam, Plaintiff was cooperative and displayed an adequate manner of relating, social skills, and overall presentation. (R. 465). According to Dr. Shapiro, Plaintiff's

"thought processes were coherent and goal directed with no evidence of delusions, hallucinations, or disordered thinking," but her mood was depressed, and Plaintiff appeared sad and tearful during the evaluation. (*Id.*). Plaintiff displayed attention and concentration throughout the interview, and her recent and remote memory skills were intact. (R. 466). But Dr. Shapiro estimated that Plaintiff's intellectual functioning was in the "deficient range." (*Id.*). Plaintiff reported that she was able to dress, bathe, groom, and can cook, but did so rarely, instead spending most of her days caring for her young son and watching television. (*Id.*). Plaintiff reported that she could drive a car but doing so made her very anxious. (*Id.*).

Dr. Shapiro found that Plaintiff appeared to have: (1) no limitations in understanding and following simple instructions and directions, or performing simple tasks; (2) mild limitations performing complex tasks and maintaining attention/concentration for tasks; (3) mild-moderate limitations regarding her ability to learn new tasks and making appropriate decisions; (4) mild-moderate limitations regarding her ability to attend a routine and maintain a schedule; and (5) moderate limitations regarding the ability to deal with stress. (R. 466–67). According to Dr. Shapiro, the "results of the examination appear to be consistent with psychiatric problems, and this may significantly interfere with the claimant's ability to function on a daily basis." (R. 467). Dr. Shapiro diagnosed Plaintiff with the following conditions: post-traumatic stress disorder with panic attacks, generalized anxiety disorder, agoraphobia, and unspecified depressive disorder. (*Id.*). Dr. Shapiro concluded that "it is recommended that [Plaintiff] become involved in treatment to deal with psychiatric symptoms." (*Id.*).

### 8) Richard Nobel, Ph.D., Consultative Psychologist

In April 2015, a State agency medical consultant, Dr. Nobel, reviewed Plaintiff's records and opined that she was not disabled, and capable of "light work." (R. 108). Dr.

Nobel found that she had limitations in sustained concentration/persistence, social interaction, and adaptation, but no limitations on understanding and memory. (R. 105–07). Based on his review, Dr. Nobel concluded that Plaintiff was: (1) moderately limited in her ability to maintain a regular schedule; (2) moderately limited in her ability to complete a normal workday without interruptions from psychological symptoms and to perform at a consistent pace; (3) moderately limited in her ability to accept instructions and respond to criticism from supervisors; and (4) moderately limited in her ability to respond appropriately to changes in the work setting. (R. 105–07).

### D. ALJ's Decision Denying Benefits

On April 17, 2017, ALJ Greisler issued a decision denying Plaintiff's application for disability benefits. (R. 10–24). At step one of the five-step evaluation process, the ALJ determined that Plaintiff had not engaged in any substantial gainful activity since February 23, 2014, the alleged onset date for her disability. (R. 15).

At step two, the ALJ determined that, under 20 C.F.R. §§ 404.1520(c), 416.920(c), Plaintiff had eight "severe" impairments: an autoimmune disorder; pulmonary hypertension/valve disease; carpal tunnel syndrome/tennis elbow; enlarged liver; obesity; anxiety; depressive disorder; and post-traumatic stress disorder. (*Id*.).

At step three, the ALJ found that, while severe, Plaintiff did not have an impairment or combination of impairments that met the criteria for one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). (R. 16). The ALJ concluded that Plaintiff's pulmonary hypertension, peripheral neuropathy, and undifferentiated connective tissue disease did not satisfy the statutory requirements to find disability. (*Id*.). Plaintiff's mental impairments also did not

"meet or medically equal the criteria of listings 12.04, 12.06, and 12.15." (*Id*.).  The ALJ found that Plaintiff had "no more than mild limitations in understanding, remembering, or applying information; interacting with others; and adapting or managing oneself," and moderate limitations with regard to "concentrating, persisting, or maintaining pace." (R. 17).

The ALJ noted that, for the consultative exam, Plaintiff's "[t]hought processes were coherent and goal directed with no evidence of delusions, hallucinations or disordered thinking" and her "attention/concentration and recent/remote memory skills were intact," but her mood was depressed and her intellectual functioning was estimated to be deficient. (R. 17).  Further, the ALJ noted that Plaintiff reported being able to dress, bathe, and groom herself, but she might need help to get dressed on occasion; she could also cook and prepare food, but did not do so unless she had to, tried to clean when she was able, but did not do laundry. (*Id*.).  Plaintiff rarely shopped and often took someone with her, but she "is able to manage money and drive." (*Id*.).  The ALJ also noted inconsistencies in what Plaintiff told the consultative examiner, such as a more positive relationship with her family and friends than she reported, and despite her alleged limitations, she could "satisfactorily care for her then 7-month old son." (*Id*.).

At step four, the ALJ determined that Plaintiff "has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a)[2] except she can occasionally climb stairs and ramps." (R. 18).  According to the ALJ, Plaintiff:

> can perform work that does not require more than simple, short
> interactions with supervisors or coworkers; and does not require
> contact with the public and, although the claimant may work in

---

[2] Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools.  Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties.  Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.  *See* 20 C.F.R. 404.1567(a) and 416.967(a).

> proximity with others, the tasks do not require working in
> conjunction with others and predominantly involve working with
> objects rather than people. The claimant can perform simple,
> routine, and repetitive tasks in a work environment free of fast paced
> production requirements, involving only simple, work-related
> decisions and few, if any, workplace changes.

(*Id*.). In support of that determination, the ALJ observed that "the record seems to indicate that [Plaintiff] is more active than alleged." (R. 19). The ALJ noted that Plaintiff was able to live alone with her then 7-month-old son who had "high needs autism," that she reported no breathlessness when walking room to room, and the record showed that she was exercising at the YMCA. (*Id*.). The ALJ also reasoned that "if the claimant's symptoms were as severe as alleged, she would take her medication as prescribed in order to alleviate same." (*Id.*). The ALJ further concluded that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." (*Id*.).

The ALJ found that "the medical record did not support a finding of disability," noting that objective medical tests, such as the Holter Monitor and echocardiograms were "unremarkable," and "showed only slightly reduced exercise capacity," with results ranging "from fair to good and improvement was noted." (R. 19). The ALJ further noted that examiners recorded inconsistent numbers of fibromyalgia tender points, with one test noting 18 of 18 and another zero, and one provider "made a point to note that the claimant clearly did not have all of the rheumatologic conditions she listed." (R. 20). Although Plaintiff had carpal tunnel syndrome, testing showed only mild sensory axon loss on one side. (*Id.*). With regard to Plaintiff's mental conditions, the ALJ noted that Plaintiff "is not taking any medication for a mental disorder and has not sought counseling related to a mental condition at any time," she

had never seen a specialist regarding a mental condition, and "[w]hile her testimony is that she has severe anxiety, her lack of treatment contradicts this statement." (*Id.*).

The ALJ gave great weight to the opinion of consultative examiner Dr. Shapiro, finding that "Dr. Shapiro's limitations are consistent with the ability to perform simple work in a low stress, low contact environment such as that contemplated by the residual functional capacity." (R. 20). The ALJ cited Dr. Shapiro's determination that Plaintiff had: (1) "no limitations in understanding and following simple instructions and directions and performing simple tasks"; (2) "mild" limitations in her ability to perform complex tasks and to maintain attention and concentration; and (3) "mild-moderate" limitations in her ability to attend to a routine, maintain a schedule, make appropriate decisions, and learn new tasks. (*Id.*). The ALJ also noted Dr. Shapiro's finding of "moderate limitations in the claimant's ability to consistently relate to and interact well with others and deal with stress." (R. 20).

The ALJ also gave great weight to the opinion of the state agency psychological consultant, Dr. Nobel, because his opinion was "consistent with the record as a whole as well as the claimant's lack of treatment." (R. 20). Nobel ultimately concluded that Plaintiff "retained the ability to perform semi-skilled to unskilled work." (*Id.*).

The ALJ gave partial weight to NP Hollenbeck's opinions (including the one cosigned by Dr. Duckett). (R. 20–21). However, the ALJ disagreed with NP Hollenbeck's assessments "with regard to the nature of the claimant's limitations," finding that "the severity which [NP Hollenbeck] identifies is not supported by the record." (*Id.*). The ALJ rejected as "purely speculative" NP Hollenbeck's assessments that Plaintiff "could sit for less than two hours and stand/walk for less than two hours"; that "she would need more than 10 unscheduled breaks per day"; and that she "would be absent from work for more than four days per month." (R. 21).

The ALJ also gave partial weight to Dr. McSwain's opinion because she agreed with the finding that Plaintiff "was not very limited in any of the areas being evaluated," and that Plaintiff experienced only "moderate limitations in [her] ability to walk, stand, lift, carry, push, pull, bend, climb, and interact appropriately with others." (R. 21–22). The ALJ stated that she gave the opinion partial weight because the "conclusion that the claimant is permanently disabled is not consistent with the limitations he identifies." (R. 22).

As to Dr. White's opinion that Plaintiff was "unable to work as a nurse assistant for 30 days" due to her heart function and anxiety, the ALJ gave the opinion partial weight because it was only temporary and "based, in part, on a reported diagnosis of anxiety which is not related to Dr. White's specialty." (R. 22).

After considering these medical opinions, the ALJ found that "the record supports a finding that the claimant is capable of simple work in a low stress, low contact environment, which is performed at the sedentary exertional level, with the postural, manipulative and environmental limitations contemplated by the residual functional capacity." (R. 22). The ALJ concluded that Plaintiff's residual functional capacity assessment was "supported by the opinions of Dr. Nobel, Nurse Practitioner Hollenbeck, Dr. White, Dr. McSwain, Dr. Shapiro and Dr. Duckett; the objective medical evidence of record; and the claimant's activity level." (*Id.*).

Finally, at step five, the ALJ found that "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform." (R. 23). Although Plaintiff could not perform her past work as a nurse's aide, the ALJ cited the testimony of the vocational expert that an individual with Plaintiff's limitations would be able to perform the requirements

of occupations such as "document preparer" and "addresser." (*Id.*). Therefore, the ALJ concluded that Plaintiff was not disabled because she was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." (R. 23–24). The Appeals Council denied Plaintiff's request for further review. (R. 1–6).

## III. DISCUSSION

### A. Disability Standard

To be considered disabled, a claimant must establish that he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). In addition, the claimant's impairment(s) must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." 42 U.S.C. § 1382c(a)(3)(B).

The SSA uses a five-step process to evaluate disability claims:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [*per se*] disabled . . . . Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Selian v. Astrue*, 708 F.3d 409, 417–18 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 20 C.F.R. § 404.1520. The Regulations define residual functional capacity ("RFC") as "the most [a claimant] can still do despite your limitations." 20 C.F.R. § 404.1545. In assessing the RFC of a claimant with multiple impairments, the SSA considers all "medically determinable impairments," including impairments that are not severe. *Id*. § 404.1545(a)(2). The claimant bears the burden of establishing disability at the first four steps; the Commissioner bears the burden at the last. *Selian*, 708 F.3d at 418.

## B. Standard of Review

In reviewing a final decision by the Commissioner under 42 U.S.C. § 405, the Court does not determine *de novo* whether Plaintiff is disabled. Rather, the Court must review the administrative record to determine whether "there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009).

When evaluating the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian*, 708 F.3d at 417 (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon a legal error. 42 U.S.C. § 405(g); *Selian*, 708 F.3d at 417; *Talavera*, 697 F.3d at 151. "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 447–48 (2d Cir. 2012) (quoting *Moran*, 569 F.3d at 112). The substantial evidence standard is "very deferential," and the Court may only reject the facts found by the ALJ "if a

reasonable factfinder would *have to conclude otherwise*." *Id.* at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)).

Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (quoting *Schauer v. Schweiker*, 675 F.2d 55, 57 (2d Cir. 1982)).

### C.  Analysis

Plaintiff asserts three arguments challenging the Commissioner's decision.  (Dkt. No. 9). Specifically, Plaintiff contends that the ALJ erred by: (1) determining an RFC that was not supported by any physical opinion testimony; (2) mischaracterizing the record in order to limit the weight given to Plaintiff's testimony and the treating physicians' opinions; and (3) failing to reconcile limitations listed in a medical opinion that she afforded great weight.  (*Id.*).  The Court will address each argument in turn.

#### 1.  Evaluation of Physical Opinions

Plaintiff argues that "[t]he RFC is not supported by substantial evidence as the ALJ subordinated all physical opinions to the psychiatric opinions of the non-treating providers, and therefore had no physical opinion testimony to support the RFC determination."  (Dkt. No. 9, pp. 17–23).  Plaintiff claims that: (1) the ALJ erred in affording only partial weight to the opinions of Plaintiff's physical treating providers; and (2) the ALJ failed to account for the two medical source statements by Dr. Neupane.  (*Id.*).  In response, the Commissioner asserts that "the ALJ properly determined Plaintiff's physical RFC and properly weighed the opinions of her doctors."  (*See* Dkt. No. 13, pp. 14–22).  Among other things, the Commissioner points to evidence supporting the ALJ's decision to afford only partial weight to NP Hollenbeck, and

Drs. McSwain and White. (*Id.*, pp. 14–19). Further, the Commissioner contends that Dr. Neupane "did not provide any opinion on [Plaintiff's] functional limitations," and that the RFC is still consistent with his medical source statements. (*Id.*, p. 20).

In deciding a disability claim, an ALJ is tasked with "weigh[ing] all of the evidence available to make an RFC finding that [is] consistent with the record as a whole," even if that finding does not perfectly correspond with any of the opinions of cited medical sources. *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013). However, an ALJ is not a medical professional, and "is not qualified to assess a claimant's RFC on the basis of bare medical findings." *Ortiz v. Colvin*, 298 F. Supp. 3d 581, 586 (W.D.N.Y. 2018). In other words, there must be substantial evidence to support a finding of functional limitations or lack thereof.

Relatedly, under the treating physician rule, an ALJ owes "deference to the medical opinion of a claimant's treating physician[s]." *Church v. Colvin*, 195 F. Supp. 3d 450, 453 (N.D.N.Y. 2016) (citing *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004)). However, "[w]hen a treating physician's opinion is not consistent with other substantial evidence in the record, such as the opinions of other medical experts, . . . the hearing officer need not give the treating source opinion controlling weight." *Id*. When a treating physician's opinions are disregarded, the ALJ must provide "good reasons" for doing so. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Here, Plaintiff's claim that the RFC was unsupported by any physical opinions is belied by the record. Plaintiff's argument relies heavily on NP Hollenbeck's March 2016 assessment (cosigned by Dr. Duckett) that Plaintiff could only sit for no more than 15 minutes at a time, and could only stand for 10 minutes at a time. (R. 559). NP Hollenbeck also estimated that Plaintiff could sit, stand, and walk for no more than two hours a day. (*Id.*). The ALJ

recognized that NP Hollenbeck had a longitudinal treating relationship with Plaintiff, however, the ALJ gave good reasons for discounting her opinions. Notably, the ALJ found that they were "not supported by the record," and further, that her "estimates as to time off task and absences from work are purely speculative." (R. 20–21). The ALJ's decision points to evidence that Plaintiff: (1) was able to live alone and care for her 7-month-old son; (2) reported exercising at the YMCA; (3) reported no breathlessness when walking room to room; and (4) had failed to follow treatment recommendations. (*Id.*). Thus, the ALJ found that, although "[Plaintiff] testified to extreme exertional limitations [ ], the record seems to indicate that she is more active than alleged." (R. 19).

Further, the ALJ found that Plaintiff's reported symptoms were not entirely consistent with the medical evidence. (R. 19). The ALJ noted the opinion of Dr. McSwain, Plaintiff's primary care physician, that she had only "moderate limitations" in her ability to walk, stand, lift, carry, push, pull, bend, and climb. (*See* R. 21–22, 596–97). Indeed, Dr. McSwain found that there was no evidence that Plaintiff had any limitations to sitting, and had no more than moderate limitations to any other functional capability. (*See* R. 596–97). Consistent with Dr. McSwain's findings, Dr. White also found that Plaintiff's "spontaneous range of motion was quite good," and that her exercise tolerance is only "mild[ly] limited." (R. 541, 544). The ALJ afforded Drs. McSwain and White partial weight and acknowledged them as Plaintiff's "treating providers." (R. 21–22). The ALJ also noted evidence showing that: (1) the Holter heart monitor results were "unremarkable"; (2) a stress echocardiograms "showed only slightly reduced exercise capacity with a low average functional capacity for the claimant's age and ejection fraction increased post exercise"; (3) echocardiograms ranged "from fair to good and improvement was noted"; (4) spirometry showed only mild obstructive airway disease with

normal diffusion lung capacity"; (5) inconsistent trigger point results in testing for fibromyalgia; and (6) only mild to moderate bilateral carpal tunnel syndrome with "mild sensory axon loss" on the left side. (R. 19–20).

Thus, contrary to Plaintiff's argument, the physical aspects of the RFC are supported by substantial evidence, including portions of the opinions of Drs. McSwain and White, the objective medical tests, and Plaintiff's testimony as to her own activities. In other words, although the ALJ rejected some portions of the treating physicians' opinions, the RFC is nonetheless consistent with the record as a whole. *See Pellam v. Astrue*, 508 F. App'x 87, 90 (2d Cir. 2013) (upholding ALJ's RFC determination where he "rejected" physician's opinion but relied on physician's findings and treatment notes). Indeed, courts have frequently found that moderate limitations to a claimants' ability to walk, sit, or stand for prolonged periods are not inconsistent with an RFC for sedentary work. *See, e.g.*, *Hill v. Berryhill*, No. 17-CV-6532, 2019 WL 144920, at *7, 2019 U.S. Dist. LEXIS 4089, at *9–10 (W.D.N.Y. Jan. 9, 2019) (holding that "moderate limitations in [the claimant's] ability to engage in prolonged sitting, standing and walking" were "not inconsistent with a sedentary work limitation"); *Carroll v. Colvin*, No. 13-CV-456, 2014 WL 2945797, at *4, 2014 U.S. Dist. LEXIS 88819, at *10 (W.D.N.Y. June 30, 2014) (acknowledging that "several courts have upheld an ALJ's decision that the claimant could perform light or sedentary work even when there is evidence that the claimant had moderate difficulties in prolonged sitting or standing") (collecting cases). Moreover, the ALJ did not err in rejecting the opinion that Plaintiff was completely disabled because that decision is reserved to the Commissioner. *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Next, Plaintiff argues that the ALJ erred by failing to consider Dr. Neupane's medical source statements.  However, although an ALJ commits procedural error by failing to properly discuss a treating physician's opinion, the Second Circuit has instructed that the ALJ's findings may be affirmed if "a searching review of the record assures [the Court] that the substance of the treating physician rule was not traversed." *Estrella v. Berryhill*, 925 F.3d 90, 96 (2d Cir. 2019) (internal quotation marks omitted) (quoting *Halloran*, 362 F.3d at 33).  Here, Dr. Neupane left most of his evaluation forms entirely blank and provided no assessments whatsoever as to Plaintiff's specific functional limitations.  (*See* R. 901–09).  Instead, Dr. Neupane noted that Plaintiff needed a functional capacity evaluation.  (*See* R. 902, 907). Although Dr. Neupane indicated that Plaintiff had fatigue and fibromyalgia that "may get worse with stress and temperature change," the RFC already accounted for these limitations by explicitly restricting Plaintiff to low stress sedentary work without temperature extremes.  (*See* R. 18).  Thus, to the extent the ALJ erred in failing to consider Dr. Neupane's opinions, the error was harmless.  *See Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (declining to remand even though the ALJ failed to satisfy the treating physician rule where "application of the correct legal principle could lead [only to the same] conclusion"); *Ryan v. Astrue,* 650 F. Supp. 2d 207, 217 (N.D.N.Y. 2009) (finding that, although the ALJ improperly discounted the treating physician's opinion, that error was harmless nonetheless because the ALJ had sufficiently included the relevant limitations within in the RFC).

In sum, the Court finds that the ALJ sufficiently accounted for Plaintiff's physical limitations and developed a well-supported RFC based on substantial evidence.  Accordingly, remand is not warranted on this basis.

## 2. Characterization of the Record

Second, Plaintiff argues that the "RFC is unsupported by substantial evidence as the ALJ improperly mischaracterized the record in order to limit the weight granted to Plaintiff's testimony and the treating physician's opinions." (*See* Dkt. No. 9, pp. 14–17). Plaintiff cites several examples of the ALJ allegedly "misquoting and mischaracterizing" the record, including the findings that: (1) Plaintiff lived alone with her young son who had "high needs autism"; (2) that Plaintiff was "willful in what she is able to do"; (3) some of Plaintiff's examinations for fibromyalgia "did not show an adequate number of trigger points"; and (4) Plaintiff "did not have all of the rheumatological conditions she listed." (*Id*., pp. 16–17). According to Plaintiff, "these examples were used to limit the weight and credibility given to Plaintiff's testimony and the opinion of her treating providers." (*Id*., p. 17). In response, the Commissioner argues that "Plaintiff's claim that the ALJ selectively credited parts of the record while ignoring others does not hold up to scrutiny." (Dkt. No. 13, pp. 22–25).

An ALJ may not simply "'pick and choose' evidence in the record that supports his conclusions." *Hamilton v. Comm'r of Soc. Sec.*, 105 F. Supp. 3d 223, 227 (N.D.N.Y. 2015) (citing *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004)). However, "it is also 'not required that the ALJ have mentioned every item of testimony presented to him or have explained why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'" *Thomas v. Berryhill*, 337 F. Supp. 3d 235, 344 (W.D.N.Y 2018) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983)). "What is required is that the ALJ explain the bases for her findings with sufficient specificity to permit meaningful review." *Wynn v. Comm'r of Soc. Sec.*, 342 F. Supp. 3d 340, 348 (W.D.N.Y. 2018) (citation and alteration omitted).

After careful review of the ALJ's decision and the underlying record, the Court finds that none of the alleged inaccuracies cited by Plaintiff amount to "mischaracterizations" of the evidence.  The ALJ accurately cites to evidence supporting her determination that Plaintiff was capable of sedentary work with additional restrictions.  Specifically, the ALJ correctly cited evidence showing that Plaintiff: (1) lived alone with her young son with special health needs (*see* R. 17–19, 528, 565, 913, 953); (2) exercised at the YMCA (*see* R. 19, 717); and (3) had undergone several fibromyalgia exams with inconsistent results (*see* R. 20, 434, 882, 914, 919).  In addition, the ALJ also discounted Plaintiff's testimony based on her history of poor compliance with prescribed medical treatment.  (*See* R. 19, 566, 717, 910).  The ALJ concluded that "[i]f claimant's symptoms were as severe as alleged, she would take her medication as prescribed in order to attempt to alleviate [them]."  (R. 19).  While Plaintiff may disagree with the ALJ's findings, the record shows factual support for each one, and the ALJ had discretion to resolve conflicts in the record.  *See Perozzi v. Berryhill*, 287 F. Supp. 3d 471, 487 (S.D.N.Y. 2018) (noting that ALJ has authority "to resolve conflicts in the record, including with reference to a claimant's reported activities of daily living") (citing *Domm v. Colvin*, 579 F. App'x 27, 28 (2d Cir. 2014)).

The Court finds that the ALJ's decision to discount Plaintiff's testimony was supported by accurate and substantial evidence.  Accordingly, the argument that the ALJ mischaracterized the record is without merit.

### 3.  Consideration of Dr. Shapiro's Opinion

Finally, Plaintiff argues that "the RFC is not supported by substantial evidence as the ALJ failed to reconcile limitations listed in [Dr. Shapiro's] opinion[,] [which] she afforded great weight."  (Dkt. No. 9, pp. 23–24).  Specifically, Plaintiff contends that the ALJ failed to address

in the RFC Dr. Shapiro's opinion that Plaintiff had "mild-moderate limitations regarding her ability to attend to a routine and maintain a schedule." (*Id.*, p. 24). Plaintiff further notes that Dr. Neupane, Dr. Duckett, and NP Hollenbeck opined that she was unable to maintain a routine schedule or remain on task. (*Id.*).

Although the ALJ did not specifically address Dr. Shapiro's opinion in formulating Plaintiff's RFC, the two are compatible nonetheless. As discussed above, moderate limitations in work-related functioning do not prevent a person from performing unskilled work. *See Zabala*, 595 F.3d at 410 ("None of the clinicians who examined [plaintiff] indicated that she had anything more than moderate limitations in her work-related functioning, and most reported less severe limitations."); *see also Whipple v. Astrue*, 479 F. App'x 367, 370 (2d Cir. 2012) (consultative examiners' findings that the plaintiff had moderate limitations in social functioning supported the ALJ's determination that plaintiff was still capable of performing work that involved simple tasks and allowed for a low-stress environment); *Wells v. Colvin*, 87 F. Supp. 3d 421, 435–36 (W.D.N.Y. 2015) (finding that moderate limitations, even in the basic mental functions of unskilled work, are not inconsistent with the ability to perform unskilled work).

Here, the ALJ gave great weight to Dr. Shapiro's opinion and ultimately limited Plaintiff's RFC to low-stress, simple work with minimal interpersonal interaction with co-workers and supervisors. (R. 18–22). This RFC is also consistent with Dr. Nobel's opinion that Plaintiff was moderately limited in her ability to maintain a regular schedule, which the ALJ gave great weight. The ALJ's analysis shows that she weighed these opinions and accounted for them in the RFC, while also giving partial weight to the more limiting opinions of NP Hollenbeck and Drs. McSwain and White. To the extent that these opinions conflicted, the

Court must defer to the ALJ's resolution since it is supported by substantial evidence, as noted above. *See Lewis v. Colvin*, 122 F. Supp. 3d 1, 7 (N.D.N.Y. 2015).

After careful review of the record, the Court finds no error in the assignment of great weight to Dr. Shapiro's opinion. Moreover, that opinion is consistent with the RFC for sedentary work with additional restrictions. Accordingly, Plaintiff's argument is without merit. *See also Flake v. Comm'r of Soc. Sec.*, No. 15-CV-1128, 2016 WL 7017355, at *10–11, 2016 U.S. Dist. LEXIS 165893, at *27–29 (N.D.N.Y. Nov. 10, 2015) (holding that the plaintiff's "moderate difficulty in her ability to regularly attend to a routine and maintain a schedule" did not preclude the ALJ from finding that the plaintiff was capable of performing the basic demand so light, unskilled work); *Lowry v. Comm'r of Soc. Sec.*, No. 15-CV-1553, 2017 WL 1290685, at *4, 2017 U.S. Dist. LEXIS 52954, at *11–12 (N.D.N.Y. Mar. 16, 2017) (holding that a "'moderate' limitation in [a plaintiff's] ability to maintain a schedule would not be inconsistent with the ALJ's RFC determination that [the plaintiff] could perform simple, routine work").

## IV.  CONCLUSION

Although Plaintiff suffers from several serious ailments, it is not for the Court to overturn the ALJ's decision if that decision was supported by substantial evidence in the record. Indeed, even "[w]here there is substantial evidence to support either position, the determination is one to be made by the factfinder." *Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). After careful review of the record, the Court concludes that the ALJ applied the correct legal standards and the decision is supported by substantial evidence.

For the foregoing reasons it is

**ORDERED** that the Commissioner's decision is **AFFIRMED**; and it is further

**ORDERED** that the Clerk of the Court is directed to close this case and provide a copy of this Memorandum-Decision and Order to the parties in accordance with the Local Rules of the Northern District of New York.

**IT IS SO ORDERED.**

Date:   August 20, 2019
           Syracuse, New York

Norman A. Mordue
Senior U.S. District Judge